UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUAN MATA,

Plaintiff,

v.

CITY OF BANGOR, et al.,

Defendants.

Case No. 1:25-cv-572

Hon. Hala Y. Jarbou

_______________________________________/

**OPINION**

Plaintiff Juan Mata brings this civil rights action against his former employer, the City of Bangor, and against Justin Weber, who was the city manager and chief of police for the City when the events at issue occurred. Mata filed his initial complaint in Berrien County Circuit Court. The City removed the action to this Court. Before the Court is Defendants' motion for summary judgment. For the reasons set forth herein, the Court will grant the motion in part and remand the case to state court for further proceedings.

## I. BACKGROUND

### A. Evidence

The following is a summary of the evidence, construing the facts and drawing all reasonable inferences in Mata's favor.

#### 1. Mata's Work History

Mata was born in 1954. He began work as a law enforcement officer in the late 1970s. First, he worked for the police department in Eau Claire, Michigan. After five years there, he worked as a corrections officer for the Berrien County Sheriff's Department for 26 and a half years. (Mata Dep. 5–6, ECF No. 25-12.) In 2010, he retired from that position and became a part-time

court officer for Berrien County; his responsibility was to maintain all the records and reports completed by officers. (*Id.* at 6–7.) He also worked weekends for the City of Watervliet as a patrol officer. (*Id.* at 7.)

In 2015, the City of Bangor's then-police chief, Tommy Simpson, approached Mata and informed him that the City had an opening for a full-time patrol officer. (*Id.* at 9.) Mata took that position.

In 2021, Simpson promoted Mata to the road patrol sergeant position, which had a higher rate of pay. (*Id.* at 17, 19; Weber Dep. 85, ECF No. 25-13.) Part of that role involved supervising other officers. (Mata Dep. 20-22; Weber Dep. 28.) Mata typically worked the night shift (Mata Dep. 42), i.e., from 7 p.m. to 7 a.m. (Weber Dep. 49). When Simpson and the deputy chief were not on duty, Mata was "basically in charge." (Mata Dep. 24.)

Weber became the deputy chief of police for the City in 2022. (Weber Dep. 23.) A few months later, Simpson resigned as chief and became the city manager, so the City made Weber the chief of police. (*Id.* at 23–24.) The City also eliminated the deputy chief position, which effectively made Mata the second highest ranking officer at the department because there were no other police sergeants employed by the department at the time. (Weber Dep. 27.)

Simpson resigned in September 2023 and then Weber became both the chief of police and the city manager. (*Id.* at 24.) Before Simpson left, he told Mata that Jeremy Uplinger, a city council member, was upset with how Mata was performing and wanted Mata removed from the department. (Mata Dep. 64.)

**2. Mata's Encounter with Uplinger**

In September 2024, Mata responded to Uplinger's home due to a report that shots had been fired at the home. (*Id.* at 26.) According to Mata, after he arrived, Uplinger approached and threatened to investigate the incident himself if Mata did not do so. (*Id.* at 27.) Uplinger also

blamed Mata for the death of a motorcyclist, referring to an incident in June 2023 when Mata pursued two motorcyclists in his police vehicle after they fled from a traffic stop. (*Id.* at 27–28.) According to an internal review conducted by Weber, one of the fleeing motorcyclists died after striking a pickup truck that was pulling onto the road. (Internal Review Rep. (June 22, 2023), ECF No. 22-3, PageID.238.) The crash disabled the truck, leaving it stuck in the road. As Mata came around a bend in the road, he was unable to avoid colliding with the truck. (*Id.*, PageID.240.) The review determined that Mata was not responsible for the motorcyclist's death, but that he had violated police policy by not ending the chase after the motorcycles had fled and by traveling "at a speed and in a manner that prevented him from being able to maintain control of his vehicle." (*Id.*, PageID.242.)

**3. Mata's Letter to City Council**

Mata believed that Uplinger had behaved inappropriately by interfering with Mata's investigation at Uplinger's home. (Mata Dep. 39.) He spoke with Weber about it, and Weber told Mata to write a letter that Weber said he would present to the city council. (*Id.* at 40.) In the letter, which is dated September 7, 2024, Mata "formally request[ed]" that the council "investigate the inappropriate behavior" of Uplinger, which Mata claimed "has had a significant impact on [the] community." (Mata Letter, ECF No. 22-4.) Mata asserted that he had "several encounters" with Uplinger in which Uplinger "presented aggressive behavior and continued interference with investigations." Mata then described his encounter at Uplinger's home:

> Most recently and most alarming, on 9/5/2024, there was a complaint in which I was called out to the home of Jeremy Uplinger . . . . During gathering information from Khylee Uplinger, Jeremy Uplinger interjected himself into the conversation by initially being aggressive but then continued to make threats that officers would have to come back out to "clean up the mess," since according to Mr. Uplinger, police were not handling the situation and that he would be taking matters into his own hands. When Mr. Uplinger was advised against taking matters into his own hands, he stated that he "was not afraid to go to prison as he'd already been there

> and that he was a felon." At that point Mr. Uplinger continued making inappropriate comments [about] the situation and me.

(Mata Letter.) Mata concluded by asking the council to "investigate and follow up with disciplinary actions against Mr. Uplinger." (*Id.*)

Mata hand delivered a copy of the letter to the city council. (Mata Dep. 25.) Weber also received a copy of the letter and forwarded it to the city attorney. (Weber Dep. 42.) No action was taken against Uplinger as a result of the letter. (*Id.*)

**4. Bikers Against Predators Incident**

On January 1, 2025, while Mata was working his night shift patrol, he was dispatched to a local park in response to a call that a private group was confronting a male individual. (Mata Dep. 42.) After arriving at the park, Mata spoke with one of the group members, who referred to the group as Bikers Against Predators and claimed that the group had lured a child predator to the park. (*Id.* at 43.) Mata called Weber for advice. Weber told him to take a written complaint. Mata detained the accused predator, took him to the station, interviewed him, and then released him. (*Id.* at 44–45.) The prosecutor declined to charge the man. (*Id.*)

Someone at the park recorded Mata's actions on video and then posted the video on Facebook and YouTube. (Weber Dep. 52–53.) The police department subsequently received "hundreds, if not thousands, of complaints" from people who had seen the videos. (*Id.* at 53.) After reviewing the video, Weber determined that Mata's "communications skills" and "investigative skills" at the time were "concerning." (*Id.* at 51.) Regarding his communication, Mata was "argumentative" with the group, asking them "what do you want me to do about it?" (*Id.* at 51.) He "did not give them clear law enforcement advice." (*Id.* at 52.) And at one point, someone in the group asked Mata whether he was drunk or had been smoking marijuana. (*Id.*) As to the investigation, Weber was dismayed that when Mata called for advice, "he did not know how

to investigate the actual incident"; Weber "had to instruct him to obtain all the evidence, . . . interview everybody involved, . . . document it, report, and send [the report] to the prosecutor's office." (*Id.*)

Due to the critical messages the police department was receiving about Mata, Weber decided to place Mata on paid administrative leave while Weber investigated the incident. (Mata Dep. 45; Weber Rep., ECF No. 22-6, PageID.253–54.) Mata received full pay and benefits during this leave, which lasted about two weeks. (Mata Dep. 46–47.)

At a council meeting in early January, several council members (but not Uplinger, who recused himself from the discussion) told Weber they believed Mata's "performance was so bad" during the Bikers Against Predators incident that "he should be terminated." (Weber Dep. 64–66.) After completing his own review, Weber decided to transfer Mata to a newly-created administrative desk sergeant position, working the day shift. (Weber Dep. 63, 66.) This new position retained the same sergeant rank and pay scale as his previous position, but Mata would no longer be supervising other officers. (Mata Dep. 49, 62.)

Weber memorialized his thoughts about Mata's reassignment in a report of his investigation into the incident at the park. He noted his concern that "Mata's interactions and communications with the [Bikers Against Predators] organization could have been better." (Internal Investigation Rep. (Jan. 31, 2025), ECF No.22-6, PageID.256.) His "demeanor portrays he is irritated that he is interacting with the organization." (*Id.*) This interaction, Weber asserted, "caused threats, a substantial amount of disrepute, and discredit to the Bangor Police Department, Sgt Mata, and law enforcement in Van Buren County." (*Id.*) Based in part on this incident, Weber recommended that Mata be reassigned to a "desk duty administrative position." (*Id.*)

Before Mata returned to work, the department circulated a memo telling officers to "submit[] what hours they want to work." (Mata Dep. 47–48.) Mata indicated that he wanted to work the day shift instead of the night shift. (*Id.*) Weber noted Mata's interest in a day-shift position in Weber's report recommending the transfer to the desk sergeant role. (Internal Investigation Rep. (Jan. 31, 2025), PageID.256.)

That same month, the City adjusted the pay scale for the police department, giving officers with seniority a higher rate of pay. (Mata Dep. 59.) That adjustment became effective in July 2025, increasing Mata's wages. (Mata Aff., ECF No. 26, PageID.469.) The City also changed the pay scale so that officers working night shifts would receive an extra dollar per hour. (Mata Dep. 59.) Mata testified that he "los[t]" that pay differential when he transferred to the new position, which he started at the end of January 2025. (*Id.* at 56, 63.) In addition, he lost the opportunity to work overtime shifts with overtime pay. (*Id.*)

**5. Mata Files Lawsuit**

Mata initiated this lawsuit on April 16, 2025. (*See* Compl., ECF No. 1-2, PageID.16.) He sued the City and Weber, claiming they "demoted" him as retaliation for his complaint against Uplinger, in violation of Michigan's Whistleblowers Protection Act and the First Amendment to the Constitution. (*Id.*, PageID.12–13.)

**6. Shooting Incident**

On August 16, 2025, Mata participated in the police department's firearms training at a firearms range. After completing the mandatory portion of the training, he returned to the department's garage to clean his firearm. While repeatedly attempting and failing to remove the slide from his gun, he shot himself in the hand. After investigating the incident, Weber prepared a report concluding that Mata "never properly inspected the firearm to see if it was loaded" and put himself and others in danger by "mishandling" it. (Internal Investigation Rep. (Aug. 29, 2025),

ECF No. 22-8, PageID.272.) Among other things, Mata "point[ed] the firearm's muzzle towards his abdomen and fail[ed] to point [it] in a safe direction."[1] (*Id.*) He then "conducte[ed] a negligent discharge while his hand [was] covering the muzzle." (*Id.*) Weber also discovered that Mata had "left his department issued rifle and shotgun unsecured at the range." (*Id.*, PageID.273.) In his report, Weber recommended that the City terminate Mata. (*Id.*)

Weber's report is accompanied by a letter from the firearms instructor for the police department, Paul Leonard. Leonard reported to Weber that, during the firearms training, he saw "several instances where Sgt. Mata appeared to struggle with understanding and following directions," and that Mata had "difficulty preparing his firearm, specifically trouble racking the slide due to weak strength and/or poor technique, difficulty loading his magazine, and difficulty with the holster retention system while trying to draw on the range." (Leonard Letter, ECF No. 22-8, PageID.274.) After the training, Leonard discovered that Mata had "left the training facility leaving both his shotgun and rifle at the range without informing any other personnel." (*Id.*) Mata, however, contends that he could not take his long guns with him because they were in Leonard's possession. (Mata Aff., PageID.469.)

Based on his review of the video, Leonard concluded that Mata "did not inspect the chamber or breech end of the firearm" to determine whether it was loaded and "dangerously placed the palm of his hand over the barrel while attempting to remove the slide." (Leonard Letter, PageID.275.) Leonard also reported that he had inspected and tested Mata's firearm and found no "malfunctions or issues" with it. (*Id.*) Accordingly, he concluded that "the incident occurred due to the careless[] handling by Sgt. Mata." (*Id.*)

[1] The video evidence supports this assertion; it shows Mata repeatedly point the barrel of the pistol toward his abdomen while trying to take the gun apart. (Police Video 10:36:48, ECF No. 22-11.)

In a letter dated August 29, 2025, Weber notified Mata that the police department was terminating him due to his "negligent[]" discharge of his "department-issued firearm inside the department's garage, resulting in a serious, self-inflicted injury." (Termination Letter, ECF No. 22-8, PageID.276.)

Mata then filed an "amended, supplemental" complaint on September 23, 2025, incorporating facts about his termination. (Am. Compl., ECF No. 13.)

**B. Claims**

In his amended complaint, Mata asserts that Defendants retaliated against him in violation of the First Amendment, Michigan's Whistleblower Protection Act (WPA), Mich. Comp. Laws § 15.361 et seq., and Michigan's Worker's Disability Compensation Act, Mich. Comp. Laws § 418.301. He also claims that Defendants discriminated against him on account of his age and race, in violation of Michigan civil rights law.

Specifically, as to his First Amendment claim, Mata asserts that Defendants "demoted" him to the administrative sergeant position in retaliation for his complaint about Uplinger. (Am. Compl. ¶ 38.) He also claims that Defendants terminated his employment in retaliation for this lawsuit and in retaliation for his complaint about Uplinger. (*Id.* ¶ 39.)

**II. STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1961)). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id*. The Court must "view

all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III. ANALYSIS

### A. First Amendment Claim

The Court will address the federal claim first. To prevail on his First Amendment retaliation claim,[2] Mata must show "(1) that [he] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [him] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [his] constitutional rights." *Adair v. County of Wayne*, 452 F.3d 482, 492 (6th Cir. 2006) (quoting *Strouss v. Mich. Dep't of Corrs.*, 250 F.3d 336, 345 (6th Cir. 2001)).

Mata claims that Defendants reassigned him to the desk sergeant position in retaliation for his complaint against Uplinger. He also contends that Defendants terminated him in retaliation for that complaint or in retaliation for filing this lawsuit.

#### 1. Protected Conduct

##### (a) City Council Letter

"Public employers can permissibly limit the speech of their employees in certain circumstances." *Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024) "Generally, the First Amendment protects a public employee's speech if: (1) the speech was on a matter of public concern; (2) the speech was not made pursuant to the employee's official duties; and, assuming the employee can satisfy the first two elements, (3) the employee's interest in speaking on a matter

[2] Mata also claims that Defendants engaged in "viewpoint discrimination," but in his response brief he contends that this claim "merges into his retaliatory termination claim for exercising First Amendment rights" because Defendants did not restrict his speech. (Pl.'s Br. 22, ECF No. 25.) That being the case, the Court will analyze his claim as a retaliation claim only.

of public concern outweighs the employer's interest 'in promoting the efficiency of the public services it performs through its employees.'" *Id.* at 783–84 (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)) (citations omitted).

The parties disagree on whether Mata complained about Uplinger as a private citizen or pursuant to his official duties, and the issue is a close question. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "Whether speech falls within a public employee's official duties does not turn solely on whether the speech contained information they obtained as a result of their employment, but depends primarily on whether the speech is 'ordinarily within the scope of an employee's duties.'" *Ashford v. Univ. of Mich.*, 89 F.4th 960, 972 (6th Cir. 2024) (quoting *Boulton v. Swanson*, 795 F.3d 526, 533–34 (6th Cir. 2015)) (citation omitted). "To determine whether speech was made pursuant to a public employee's ordinary job duties, [the Court] look[s] to factors like the speech's 'impetus,' setting, audience, and general subject matter." *Id.* (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007)). "Speech made outside an individual's chain of command is less likely to be within an employee's ordinary job responsibilities, as is speech that an employee's ordinary job responsibilities would not require them to make." *Id.* "Conversely, . . . internal escalations of concerns or grievances [are] insufficient to establish private speech when the speech directly relates to or otherwise concerns an employee's day-to-day duties." *Id.* (citing *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464–65 (6th Cir. 2017); *Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007)).

The subject of Mata's speech concerned Uplinger's alleged interference with Mata's ability to perform his official duties, which tends to suggest that Mata's speech was made in his capacity

as an employee, not as a private citizen. *See Handy-Clay v. City of Memphis*, 695 F.3d 531, 541 (6th Cir. 2012) (employee's complaints about interference with job responsibilities were made in capacity as public employee). Also, Mata first reported these concerns to his direct supervisor, Weber. Weber then told Mata to write a letter to the city council that Weber would present to the council. These facts suggest that Mata was escalating his job-related concerns up the chain of his command at the direction of his supervisor and was therefore acting pursuant to his official duties.

Mata compares his case to *Handy-Clay*, in which the plaintiff, a city records coordinator, reported her concerns about other employees' abuses of city leave and pay policies (i.e., not reporting absences from work) to a city councilman, to the city's "EEOC office," and to a human resources employee. *Handy-Clay*, 695 F.3d at 537. The Sixth Circuit noted that her "conversations with individuals outside her department were clearly not part of her official duties as public records coordinator." *Id.* at 542. The court distinguished her case from others in which the plaintiffs' "complaints were made only to their immediate supervisors." *Id.*

Mata argues that, like the employee in *Handy-Clay*, complaining to members of the city council was not part of his regular job duties. Even so, he first reported his concerns to his immediate supervisor and then submitted a complaint to the city council at the recommendation of that supervisor, which is far different from the communications by the plaintiff in *Handy-Clay* to individuals outside her department. Also, unlike the abuse-of-policy complaints in *Handy-Clay*, the subject of Mata's complaint was the performance of his own duties. Thus, *Handy-Clay* is distinguishable. *See Mayhew v. Town of Smyrna*, 856 F.3d 456, 466 (6th Cir. 2017) (distinguishing *Handy-Clay* where the plaintiff escalated complaints about his "ordinary job responsibilities" "up the organizational chart").

On the other hand, Mata himself submitted the complaint to the city council, not his supervisor. And when Weber received a copy of the complaint, he did not send it to the city council. Instead, he sent it to the city attorney because complaints "against an elected official" must "go to the city attorney." (Weber Dep. 43.) In other words, Weber's testimony suggests that Mata was going outside the usual process. And there is no evidence that making complaints to the city council was part of Mata's usual job responsibilities. Accordingly, the Court cannot conclude as a matter of law that Mata made his complaint pursuant to his official duties.

But even assuming that this complaint was protected conduct, Mata's claim fails for lack of causation, as discussed below.

**(b) April 2025 Lawsuit**

The parties do not dispute that this lawsuit qualifies as protected conduct under the First Amendment.

**2. Causation**

To prevail on his retaliation claim, Mata must demonstrate that at least one of the purportedly adverse actions—his reassignment to the desk sergeant position or his termination—was motivated in part by his protected conduct. He has failed to create a genuine dispute of fact on this issue.

**(a) Reassignment**

To support a causal connection between his letter to the city council and his assignment to the desk sergeant position, Mata testified that Uplinger had complained to Weber about Mata; Mata believes these complaints caused Weber to reassign Mata. (Mata Dep. 83.) But Mata has provided no evidence that those complaints were related to Mata's letter. Weber does recall Uplinger complaining about Mata's actions in connection with the motorcycle pursuit, but Uplinger started making those complaints *before* Mata's letter to the city council, so the complaints

are unrelated to that letter. (Weber Dep. 54.) Also, Mata offers no evidence to contradict Weber's testimony that Weber alone made the decision to reassign Mata and that Uplinger offered no opinion about Mata when Weber consulted with the city council about transferring Mata to the new desk sergeant position. True, other council members complained about Mata's performance in connection with the Biker's Against Predators incident, but there is no evidence that they raised concerns about Mata's letter. Thus, there is no basis for a reasonable jury to conclude that Weber reassigned Mata in order to mollify any concerns by Uplinger or any other city council member about Mata's letter to the council.

Mata also relies on the temporal proximity between his letter in September 2024 and the job reassignment in January 2025. When an adverse action "occurs within 'days or weeks' of the speech, the close proximity can sometimes (if rarely) permit an inference that the one motivated the other." *Lemaster v. Lawrence County*, 65 F.4th 302, 310 (6th Cir. 2023) (quoting *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020)). But where, as here, the time gap is "a matter of months," the "summary-judgment inquiry then asks whether the plaintiff has offered enough 'other evidence of retaliatory conduct' apart from this temporal proximity." *Id.* (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Mata offers no other such evidence in this case.

Indeed, the available evidence undermines a plausible connection between his letter and his reassignment. First, recall that Weber, the person who reassigned Mata, told Mata to write the letter to the city council. It would be odd for Weber to retaliate against Mata for doing what Weber himself had suggested. Second, although Mata complains that the transfer to the desk sergeant position caused him to lose the opportunity to earn extra pay by working the night shift, he acknowledges that he expressed a preference for working the day shift before Weber transferred

him. And Weber contemporaneously cited this interest as part of his rationale for the reassignment, which suggests that Weber was intentionally accommodating Mata's preferences rather than retaliating against him. Finally, there is no genuine dispute that Weber reassigned Mata to the desk position shortly after the department received heated criticism from the public and from several city council members about Mata's job performance while he was on patrol during the Bikers Against Predators incident, which was a legitimate nonretaliatory reason for the reassignment to a non-patrol position. "'[A]n intervening legitimate reason' to take an adverse employment action 'dispels an inference of retaliation based on temporal proximity.'" *Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013) (quoting *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012)); *see Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (holding that an intervening "obviously nonretaliatory basis" for the adverse action negates temporal proximity). Under the circumstances here, no reasonable jury could conclude that Mata's complaint to the city council motivated the job reassignment.

Citing *Dixon v. Gonzales*, 481 F.3d 324 (6th Cir. 2007), Mata argues that the four-month time gap does not defeat his claim because Weber purportedly moved Mata to a new position when he had the first available opportunity to do so. In *Dixon*, the Sixth Circuit noted that an extended period of time between the protected conduct and the adverse action "does not inevitably foreclose a finding of causality" where the decisionmaker with the retaliatory motive did not have the authority to take the adverse action for part of that time period and then took the adverse action at the first available opportunity after obtaining that authority. *Id.* at 334–35. Those facts are not present here. Weber was Mata's supervisor throughout the relevant time period. He could have disciplined Mata at any point in time after Mata's complaint to the council. He did not do so. *See Dixon*, 481 F.3d at 336 (rejecting a similar argument because the plaintiff's supervisor during the

time gap "clearly had the opportunity to retaliate, which is all that law requires," but he did not do so). Thus, the "first available opportunity" rationale in *Dixon* does not apply.

In short, even if the letter to the city council qualifies as protected conduct, Mata has not established a causal connection between that letter and his reassignment. Accordingly, his retaliation claim fails insofar as he claims the reassignment was motivated by his letter.

**(b) Termination**

For similar reasons, Mata has not provided any evidence from which to infer that his termination in August 2025 was motivated by his letter to the city council in September 2024. The temporal proximity between the letter and the termination is even more attenuated than the proximity between the letter and the job reassignment. Mata provides no other evidence to suggest that his letter from over a year before his termination motivated that employment action. And as with his reassignment, there was an intervening nonretaliatory basis for his termination. He clearly mishandled his pistol, injuring himself.

Likewise, there is no evidence that this lawsuit filed in April 2025 was a motivation for Weber to terminate Mata in August 2025. The four-month time gap alone does not supply a sufficient basis from which to infer causation, particularly when considering Mata's intervening negligent conduct with his firearm. Thus, Mata has failed to provide sufficient evidence to establish his retaliation claim under the First Amendment. The Court will therefore dismiss the First Amendment retaliation claim.

**B. Whistleblower Protection Act**

Mata claims that his assignment to the desk sergeant position was a violation of the WPA because the assignment was motivated by his letter to the city council. The WPA prohibits an employer from discharging or otherwise discriminating against an employee because the employee "reports or is about to report, verbally or in writing, a violation or a suspected violation of a law

or regulation or rule promulgated pursuant to [a] law of this state, a political subdivision of this state, or the United States to a public body." Mich. Comp. Laws § 15.362.

The elements of a WPA claim are similar to those for a First Amendment claim. Mata must show that (1) he was "engaged in protected activity as defined by the act," (2) he was "discharged or discriminated against," and (3) "a causal connection exists between the protected activity and the discharge or adverse employment action." *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 471–72 (Mich. 2003). This claim fails for the same reasons as the First Amendment claim. Mata offers only temporal proximity as the evidence of retaliation, yet "Michigan courts make clear that temporal proximity alone does not establish causation for a retaliation claim under the Whistleblower Protection Act." *Kellar v. Yunion, Inc.*, 157 F.4th 855, 880–81 (6th Cir. 2025). Accordingly, the Court will dismiss the WPA claim with prejudice.

**C. Supplemental Jurisdiction**

After dismissal of the First Amendment claim and the WPA claim, the remaining claims arise under state law. Ordinarily, where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal law claim is dismissed before trial, the court will dismiss the remaining state-law claims. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1996))); *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).

In determining whether to retain supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld*, 994 F.2d at 1182; *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("Residual jurisdiction

should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." (internal quotations omitted)). Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Jonny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012). Here, the balance of the relevant considerations weighs against the continued exercise of supplemental jurisdiction. Unlike the WPA claim, the remaining claims rest on different facts and legal standards. A state court is better suited to resolving those claims. Accordingly, the Court will remand those claims to the Berrien County Circuit Court.

**IV. CONCLUSION**

For the reasons stated, the Court will grant the motion for summary judgment in part and dismiss the First Amendment retaliation and WPA claims. The Court declines to exercise supplemental jurisdiction over the remaining state-law claims and will return the case to the Berrien County Circuit Court.

An order will enter consistent with this Opinion.

Dated: August 17, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE